## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

**Lorrie Cutter**

     v.

Case No. 24-cv-321-PB-AJ
Opinion No. 2025 DNH 143

**U.S. Social Security**
**Administration, Commissioner**
**Frank J. Bisignano**

## MEMORANDUM AND ORDER

Lorrie Cutter challenges the denial of her application for disability benefits pursuant to 42 U.S.C § 405(g). She argues that the Administrative Law Judge ("ALJ") committed reversible error in determining her residual functional capacity ("RFC") by failing to properly credit the medical opinions of her treatment providers that she suffers from severe anxiety, depression, and agoraphobia. Doc. 5-1 at 4. The Commissioner asks us to affirm the ALJ's RFC determination because it is legally sound and supported by substantial evidence. Doc. 7 at 1, 9.

## I. BACKGROUND

### A. Procedural Facts

Cutter applied for Title II Social Security Disability Insurance Benefits on September 27, 2022. Doc. 4-7 at 3. She alleged a disability onset date of March 12, 2020. Id. at 2. Her date last insured was September 30, 2022. Id.

She holds an associate's degree and was 49 years old on her alleged onset date. Doc. 5-2 at 2. She had previously worked as an elementary school paraprofessional, personal shopper, medical receptionist, retail cashier, and residential support professional. Doc. 7 at 1; see also Doc. 4-6.

Cutter's application for disability benefits was initially denied on June 5, 2023 and was denied on reconsideration on July 19, 2023. Doc. 4-2 at 12. The ALJ held a telephone hearing on January 30, 2024, at which Cutter was represented by an attorney and an impartial vocational expert testified. Id. On March 20, 2024, the ALJ concluded that Cutter was not disabled through her date last insured and could have adjusted to other types of work that existed in significant numbers in the national economy at that time. Id. at 25. Cutter requested review of the ALJ's determination by the Appeals Council, attaching a letter from her primary care provider in support of her appeal. Id. at 30. On August 12, 2024, the Appeals Council issued an order denying review, which rendered the ALJ's conclusion the final decision of the Commissioner. Id. at 2-7. On October 7, 2024, Cutter filed the present action seeing reversal of the Commissioner's decision. Doc. 1.

B.    **Medical Opinion Evidence**

Because Cutter primarily contends that the ALJ failed to consider the medical opinions of her treatment providers, I begin by summarizing the

medical evidence in the record. I focus on evidence regarding Cutter's principal non-exertional impairments, namely her depression, anxiety, and agoraphobia. Because Cutter does not contest the ALJ's evaluation of her exertional impairments, I discuss those impairments only briefly at the conclusion of this section.

    1.   <u>Medical Opinion Evidence Before Date Last Insured</u>

Cutter was under the care of primary care physician Mark Berman, MD, from before her alleged onset date through her date last insured.[1] Doc. 4-8; 4-12. On March 31, 2020, Berman recommended that Cutter stop working due to concerns about her asthma during the COVID-19 pandemic. Doc. 4-8 at 28. He also recommended that she continue taking Wellbutrin for depression and anxiety.[2] Id. In June 2020, Berman advised that Cutter "may return to work" so long as she wears a mask and avoids enclosed spaces due to her asthma. Id. at 34. At this time, Berman observed Cutter's depression was "allright," that she had both good and bad days, but that "[W]ellbutrin seems to be helping." Id. In October 2020, Berman suggested Cutter restart counseling because she reported anxiety and trouble sleeping. Id. at 40, 43.

---

[1]    All of Berman's meetings with Cutter after her alleged disability onset date were conducted by telephone.

[2]    Wellbutrin is an oral antidepressant. <u>Wellbutrin – Drug Summary</u>, PDR.NET, https://www.pdr.net/browse-by-drug-name?search=wellbutrin (last visited Dec. 2, 2025) [https://perma.cc/PCB5-F3A3].

In January 2021, Berman noted Cutter's depression was improving. Id. at 46-47. He added that Cutter had been "[h]ome since March" but that she would start "looking for work soon." Id. at 47.

In May 2021, Berman again noted that Cutter was "doing ok" with her depression; she had a period of "feeling very sad" from March through April 2021 but appeared to be doing better at her May 2021 appointment. Id. at 53. In September 2021, Berman noted that Cutter had depression with anxiety and urged her to begin counseling as soon as possible. Id. at 58. He added she was in a "constant state of anxiety." Id. at 59.

On December 14, 2021, Berman said Cutter's anxiety continued to be a problem and noted that she had tried Wellbutrin for a year, which Cutter said "didn't help." Id. at 68. He again urged counseling and referred her to behavioral health. Id.

Cutter began treatment with Teresa Quint, LICSW, on December 30, 2021.[3] At their first appointment, Quint noted Cutter's "increase in anxiety rumination, low energy negative self talk" and "increase in isolation." Id. at 88.

---

[3]    All of Cutter's meetings with Quint were by telephone.

On January 14, 2022, Quint said Cutter recorded a Generalized Anxiety Disorder 7-Item Assessment ("GAD-7")[4] score of 18, placing her in the "severe anxiety" category.[5] Doc. 4-9 at 5. She added Cutter's anxiety "impedes her ability to attend appointments [in] person or virtually and impacts sleep." Id. On February 8, Quint noted that Cutter "avoids triggers to past trauma – won't drive down certain roads, go to certain stores" but added that she "has left her home for the store." Doc. 4-8 at 91-92.

On March 14, Berman again met with Cutter via telephone and prescribed a low dose trial of sertraline.[6] Id. at 70. He noted that she had significant anxiety and had not worked for two years, adding that she "feels disabled" and has difficulty making commitments. Id. at 70-71. He added that Cutter reported that she could "go for a couple months and then has a 'crash' that can last several mo[nth]s" and that she has chest tightness, pain, and feels her heart is "beating out of [her] chest." Id.

---

[4]    The "GAD-7" scale is used to assess and diagnoses anxiety disorder and ranges from increasing severity from $0-21$. Robert L. Spitzer et al., A Brief Measure for Assessing Generalized Anxiety Disorder,166 ARCHIVES INTERNAL MED. 1092, 1093 (2006).

[5]    Subsequent treatment notes from Quint erroneously record Cutter's January 14, 2022 GAD-7 score as 14, not 18.

[6]    Sertraline is an oral selective serotonin reuptake inhibitor antidepressant sold under the brand name Zoloft. Zoloft—Drug Summary, PDR.NET, https://www.pdr.net/drug-summary/?drugLabelId=474 (last visited Dec. 2, 2025) [https://perma.cc/A4NM-3SD9].

On April 11, Quint noted that Cutter wondered if she had "Chronic fatigue" because "she is tired all the time, exhausted." Doc. 4-9 at 28. On April 19, Quint noted that Cutter went to the store between sessions. Id. at 32. On June 2, Quint noted Cutter's "decrease in anxiety since start of visits." Doc. 4-8 at 102. But on June 17, Quint noted that Cutter's GAD-7 and Patient Health Questionnaire ("PHQ-9") scores,[7] used to measure anxiety and depression, respectively, were "severe and moderately severe." Id. at 107. In her PHQ-9 questionnaire, Cutter noted that she had trouble concentrating "nearly every day" and felt it was extremely difficult to "work, take care of things at home, or get along with other people." Id. at 108.

On July 22, Quint noted that Cutter reported that "leaving the home is harder lately" and added that she "mostly orders things online, avoids appointments, stores." Id. at 117. Quint noted that Cutter said "she maybe goes to the convenience store once a month" because she "just do[es]n't feel safe even when [she is] safe." Id. On August 5, Quint noted that she should "[rule out] agoraphobia (symptoms do appear informed by PTSD)." Id.

---

[7]    The Patient Health Questionnaire ("PHQ-9") is a module that scores each of the 9 DSM-IV criteria to measure the severity of depression. The scores range from 0-27 and are divided into categories of increasing severity: 0-4, 5-9, 10-14, 15-19, and 20 or greater. Kurt Kroenke, et al., The PHQ-9: Validity of a Brief Depression Severity Measure, 16 J. GEN. INTERNAL MED. 606, 607 (2001).

Over the course of several weeks in 2022, Quint encouraged Cutter to engage in more extensive mental health treatment at Community Partners. Cutter finally heeded Quint's advice and began treatment at Community Partners in August 2022. Cutter was treated by Heather Merrill, LCMHC, Virginia Roper, APRN, and Traci Debatis, MSW over the course of her treatment at Community Partners.[8] On August 1, 2022, Merrill conducted an initial intake of Cutter. Doc. 4-10 at 116. She noted that records documented Cutter's "historical diagnoses [at Community Partners] of Major Depressive Disorder and Panic Disorder with Agoraphobia" before 2012. Id. Merrill added that Cutter had a previous treatment relationship at Community Partners for these impairments, but Cutter ended that treatment in 2012 "when she obtained a job and could not attend therapy appointments around her work schedule." Id. Merrill said she spoke with Cutter via phone because "symptoms make it nearly impossible for [Cutter] to venture out of the home." Id. Merrill noted that Cutter reported "her anxiety has become drastically worse, particularly since 2020 when she ceased working and retreated into her home." Id. Merrill said Cutter reported she "almost never leaves her home" and that leaving the apartment required "intense

_____

[8]    All of Cutter's meetings with treatment providers at Community Partners were by telephone.

preparation." Id. Merrill said Cutter had not gotten medical care because of her inability to leave the house and that tasks like taking out the trash required several days of preparation. Id. Merrill noted that Cutter had worked at a residential home until 2020 "when the pandemic began at which point her anxiety became overwhelming and she ceased working." Id. She added that Cutter reported "her current mental health is interfering with seeking employment." Id. at 118. Regarding Cutter's agoraphobia, Merrill noted it was in remission until 2020 "when she left her job due to pandemic." Id. Cutter reported "over 2 years of intense panic upon leaving the home to the point of not getting necessary medical care, food, or essentials" and worry about danger when leaving the house "despite knowing this is unlikely." Id. Merrill's diagnosis was that Cutter suffered from agoraphobia and her opinion was cosigned by Robert Allister, MD, on August 17, 2022. Id.

Debatis first met Cutter on September 19, 2022.[9] Doc. 4-11 at 140. Cutter stated that she was seeking treatment at Community Partners because she would "like to work on getting out of the house more." Id. Cutter presented with "increased symptoms of anxiety and panic attacks related to leaving the house or going out in public" and reported that she avoided going

---

[9]    Debatis later reports she began her treatment relationship with Cutter on August 1, 2022, but the first treatment record in the evidentiary record is dated September 19, 2022. Doc. 4-11 at 134.

places and seeing people. Id. On September 28, Debatis observed that Cutter had difficulty moving her car but did complete the task successfully, in addition to taking out her trash. Id. at 141.

On September 28, 2022, Cutter met by telephone with Virginia Roper, APRN, for a psychiatric visit through Community Partners. Doc. 4-10 at 121. Roper reported that Cutter "cannot leave [her] house." Id. She noted Cutter has had anxiety regarding leaving her house for a long time and believed this fear started in 2016, when her youngest child left home, or in 2015, "after she was in a head-on car accident." Id. Roper noted that Cutter "makes sure there is nobody in the hallway" when she leaves the house and "checks traffic conditions before she leaves." Id. Cutter also reported that she "usually only leaves home to go to the pharmacy." Id. Cutter told Roper that Berman had recently prescribed sertraline but that she did not take it after reading about it online. Id. She also reported being prescribed "Wellbutrin, Cymbalta,[10]

---

[10] Cymbalta is an "oral serotonin norepinephrine reuptake inhibitor (SNRI) antidepressant" indicated for depression, chronic musculoskeletal pain, and generalized anxiety disorder, inter alia. Cymbalta – Drug Summary, PDR.NET, https://www.pdr.net/drug-summary/?drugLabelId=288 (last visited Dec. 2, 2025) [https://perma.cc/L3ZM-86JH].

Prozac,[11] and Seroquel[12]" and added that "[n]o medication helped." Id. Roper's

mental status exam found Cutter was "pleasant, forthcoming, and

cooperative," with a euthymic mood and stable affect. Id.

    2.    <u>Medical Opinion Evidence After Cutter's Date Last Insured</u>

Debatis continued to treat Cutter from October 3, 2022 through

January 5, 2024. Doc 4-11; 4-12. For the sake of brevity, I discuss her

treatment notes during this period only insofar as they materially address

Cutter's agoraphobia, anxiety, ADHD, and depression. In October through

December 2022, Cutter reported struggling with daily life, anxiety

surrounding medical appointments, and some difficulty leaving the house.

Doc. 4-11 at 142-50. Although Cutter reported leaving the house on occasion,

she said she had to prepare before doing so. Id. at 145.

In January and February 2023, Cutter reported increased anxiety and

depression, in addition to continued difficulties leaving her apartment. Id. at

151-58. These difficulties continued into March and April of that year, when

---

[11]    Prozac is an "[o]ral selective serotonin reuptake inhibitor (SSRI) antidepressant" indicated for depression, obsessive compulsive disorder and panic disorder, inter alia. <u>Prozac – Drug Summary</u>, PDR.NET, https://www.pdr.net/drug-summary/?drugLabelId=3205 (last visited Dec. 2, 2025) [https://perma.cc/2FVG-DJW2].

[12]    Seroquel is an atypical antipsychotic. <u>Seroquel – Drug Summary</u>, PDR.NET, https://www.pdr.net/drug-summary/?drugLabelId=2185 (last visited Dec. 2, 2025) [https://perma.cc/7T2E-LVH7].

she reported challenges navigating daily life, and, on occasion, intense panic and anxiety. Id. at 159-62.

In May, Cutter participated in a neuropsychological evaluation conducted by Catherine Leveroni, PhD. Doc. 4-9 at 41. Dr. Leveroni noted that Cutter reported that her agoraphobia had worsened during the pandemic and that she suffers physical symptoms like shakiness, weakness, and occasionally nausea and vomiting as a result of her impairment. Id. She told Leveroni she had only left her house three times in the past three years, including the appointment with Leveroni. Id. Leveroni also said Cutter had ADHD. Id. at 43. Leveroni found Cutter was "alert, attentive, and fully cooperative," her single word reading/work recognition score was "high normal," and other language tests were "average." Id. Leveroni concluded Cutter "is a bright and insightful woman who shows strong performances across measures of language functions, visuospatial skills, abstraction, reasoning, cognitive flexibility, and social cognition." Id. at 45. However, Leveroni did conclude that Cutter had "mild difficulty with inhibitory attentional control and significant difficulty with learning and memory in the context of anxiety and distress." Id.

On August 2, 2023, Debatis completed her first "Mental Residual Functional Capacity Assessment" ("MRFCA") for Cutter. Doc 4-11 at 127-30.

In this document, Debatis answered questions about Cutter's mental health impairments and explained how Cutter's "ability to perform certain job functions is affected by the impairment[s]." Id. at 127. She listed Cutter's primary diagnosis as agoraphobia. Id. She found that Cutter had marked limitations in her ability to "understand and remember detailed instructions," "carry out detailed instructions," "maintain attention . . . for extended periods," "perform activities within a schedule, maintain regular attendance, and be punctual," "sustain ordinary routine without special supervision," "work in coordination with or proximity to others without being distracted by them," "interact appropriately with the general public," "ask simple questions or request assistance," "accept instructions and respond appropriately to criticism," "respond appropriately to changes in the work setting," "set realistic goals or make plans independently," and "tolerate normal levels of stress." Id. at 128-30. She found that Cutter had extreme limitations in her ability to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of and length of rest periods" and "travel in unfamiliar places or use public transportation." Id. at 129-30. Debatis noted that she had treated Cutter between August 1, 2022 and July 28, 2023 but concluded that Cutter "has been functioning at this

level since 2020 when she stopped working due to increased symptoms of mental impairment." Id. She said that Cutter's agoraphobia would substantially interfere with her ability to work on a sustained ability twenty percent of the time and cause her to miss work "10 days per month." Id. at 130.

Debatis completed a second MRFCA for Cutter on November 21.[13] Doc. 4-12 at 41-44. This MRFCA largely replicated her findings in the August 2 MRFCA, except in two important respects. Id. at 41-44. First, Berman cosigned her second MRFCA on December 26, 2023. Id. at 44. Second, instead of saying Cutter would need to miss work ten days per month because of her agoraphobia, the November MRFCA said Cutter would need to miss work over twenty days per month because of her agoraphobia. Id.

    3.   <u>Hearing Testimony</u>

The ALJ conducted a hearing in which Cutter, her attorney, and an impartial vocational expert participated on January 30, 2024. Doc 4-2 at 42. Cutter testified that she had been in behavior therapy since August 2022 and had recently been prescribed Wellbutrin. Id. However, she noted that she did "not really" benefit from Wellbutrin because it exacerbated her vertigo. Id.

---

[13]    I refer to the second MRFCA in this Memorandum and Order as the Debatis/Berman MRFCA.

She also explained that she had not tried sertraline because of possible side effects and added she had been taking ADHD medication until 2021. Id. at 49.

Cutter then described the state of her daily functioning. She said she had trouble checking her mail, did not go to the store, and had groceries delivered, but then noted that she "drove to the post office last week" without going in. Id. at 45. She reported that she had gone into a store the previous week "to get gas." Id. She said her functioning was "very low" and described herself as "mostly couch-bound." Id. at 46. She said she suffered constant pain and fatigue but could not identify the cause, adding that she felt "least bad" lying down. Id. She described having difficulty engaging in self-care and said sometimes taking a shower was all she could manage for the day; sometimes she could not even manage that. Id. at 47.

Cutter said she stopped working in March 2020 because of COVID and her asthma, and that "since that time, it feels like [she's] never recovered from that illness – that's when the vertigo started." Id. at 47. She said that "pain, fatigue, and . . . agoraphobia" are the biggest "symptoms" preventing her from working. Id. She noted that she does not have difficulty seeing people because of her agoraphobia but that leaving her house "has become a

major issue." Id. at 48. She said ADHD impacts her executive functioning, working memory, and focus. Id.

Vocational expert Lisa Atkinson found that Cutter could not perform any past work. Id. at 55. She said, however, that given the ALJ's proposed assessment of Cutter's RFC, which did not include any non-exertional limitations for anxiety or agoraphobia, there were several jobs that were available in the national economy that Cutter could perform—namely, "merchandise maker," "assembler, small parts," and "routing clerk." Id. at 56. Atkinson said that an individual with the hypothetical RFC proposed by the ALJ would not be able to maintain full time work if she was "off task more than 15% of the workday on a consistent basis." Id. She added that most employers would not tolerate absenteeism at the rate of missing work two or more times per month on a consistent basis. Id.

4.    State Agency Consultant Opinions

The state agency psychological consultants who reviewed Cutter's disability claim found there was insufficient evidence to evaluate her claim regarding mental impairments during the covered period. Doc 4-3 at 2, 6, 12. On June 5, 2023, Craig E. Stensile, PhD reported that Cutter's statements about the "intensity, persistence, and functionally limiting effects" of her mental symptoms were not substantiated by medical evidence alone, and that

her statements about her symptoms were only "[p]artially consistent" with the evidence in her file. Id. at 7.

      5.    <u>Medical Evidence Regarding Cutter's Physical Impairments</u>

Cutter listed the following physical impairments on her claim for disability: asthma, temporal lobe epilepsy, allergies, and knee injury. Doc. 4-3 at 3. Berman noted Cutter's asthma on March 31, 2020, which led him to recommend that she not return to work until "the covid epidemic resolves." Doc. 4-8 at 28. Past surgical history documented in Dr. Berman's records shows that Cutter suffered from a seizure disorder and "lumbar back pain." Id. at 30. In September 2022, Roper documented that Cutter injured her knee and chest in a 2016 head-on car accident. Doc. 4-10 at 121. While the medical evidence shows records of Cutter's allergies, none are addressed at length.

State agency medical consultant Jack McWatters, MD reviewed Cutter's records in July 2023 and evaluated her physical residual functional capacity. He found she had "chronic low back pain," "asthma," "severe obesity," and a "prior knee injury." Doc. 4-3 at 14. He found historical evidence of Cutter having "temporal lobe epilepsy without evidence for lack of control." Id. Given these non-exertional impairments, he found Cutter could:

> [P]erform light work through the date last insured, except never climbing ladders, ropes, or scaffolds, occasionally performing all other postural maneuvers, avoiding all exposure to hazards, and avoiding concentrated exposure to temperature extremes,

wetness, humidity, vibration, fumes, odors, dusts, gases, and poor
ventilation.

Doc. 4-2 at 22 (citing Doc. 4-3 at 13-14).

## C.    The ALJ Determination

The ALJ followed the "five-step sequential evaluation process" for
determining whether Cutter qualified for disability benefits.

20 C.F.R. § 404.1520. At step one, the ALJ determined that Cutter had not
engaged in substantial gainful employment from March 12, 2020 through
September 30, 2022, her date last insured. Doc 4-2 at 14; see

20 C.F.R. § 404.1571. At step two, the ALJ found that Cutter's epilepsy,
degenerative disc disease, obesity, post-traumatic stress disorder, depression,
anxiety, and an alcohol use disorder were all "severe impairments" under

20 C.F.R. § 404.1520(c). Doc 4-2 at 14. The ALJ concluded that Cutter's
asthma was not severe, despite Berman's initial recommendation that she
stop working during the COVID-19 pandemic because of it. Id. at 15. The ALJ
instead concluded that medical evidence showed that Cutter could return to
work with a mask in June 2020; he accordingly included environmental
limitations in the RFC to "avoid exacerbations of asthma." Id. He also
determined that Cutter's vertigo, pain, and fatigue were not medically
determinable impairments. Id.

At step three, the ALJ determined that Cutter did not have an impairment or combination of impairments that met or medically equaled the severity of any listed impairments. Id. In reaching this conclusion, he determined that the "severity of the claimant's mental impairments, considered singly and in combination, did not meet or medically equal the criteria of listings 12.04, 12.06, and 12.15," which reference "depressive, bipolar and related disorders," "anxiety and obsessive-compulsive disorders," and "trauma- and stressor-related disorders," respectively. Id. at 16; see also 404 C.F.R. Pt. 404, Subpt. P, App. 1. The ALJ based this finding in part upon the moderate nature of Cutter's limitations in the following areas: "understanding, remembering, or applying information"; "interacting with others"; "concentrating, persisting, or maintaining pace"; and "adapting or managing oneself." Id. at 16-17.

Having found that Cutter's impairments did not meet or equal a listed impairment, the ALJ then determined Cutter's RFC pursuant to 20 C.F.R. § 404.1520(e). He found that, through September 30, 2022, Cutter had:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except occasionally climbing stairs and ramps, never climbing ladders, ropes, or scaffolds, and occasionally balancing, stooping, kneeling, crouching, and crawling, with balancing further defined as needing to avoid narrow, slippery, and erratic moving surfaces; must avoid

> concentrated exposure to temperature extremes, wetness,
> humidity, vibrations, fumes, odors, dust, gas, and poor
> ventilation; must avoid all hazards such as dangerous machinery
> and unprotected heights; can understand and remember very
> short, simple instructions, can sustain occasional social
> interaction with the general public, coworkers, and supervisors,
> can maintain concentration, persistence, and pace for two-hour
> blocks of time over an eight-hour workday and 40-hour
> workweek, and can adapt to infrequent (occasional) changes in
> work routine.

Id. at 18. In making this determination, the ALJ first considered whether
Cutter had underlying, medically determinable physical or mental
impairments that could produce her symptoms. Id. Having established that
such impairments could produce her symptoms, the ALJ then assessed the
"intensity, persistence, and limiting effects of the claimant's symptoms to
determine the extent to which they limit the claimant's work-related
activities." Id. He found that Cutter's statements about the "intensity,
persistence and limiting effects of [her] symptoms are not entirely consistent
with the medical evidence and other evidence in the record." Id. at 19.

The ALJ first noted that medical evidence showed Cutter's "asthma
was controlled with medication" and added that he "included environmental
limitations in the RFC to avoid exacerbations of asthma." Id. at 20 (citing
Doc. 4-8 at 28-29, 34). He then assessed the extent to which Cutter's mental
impairments and agoraphobia limited her work-related activities. Id. at 19.
Here, he found that while the medical evidence "supports some limitations

resulting from the claimant's impairments, the objective examinations and
other diagnostic techniques usually show only mild abnormalities with many
normal findings." Id. He added that where medical evidence showed
"significant findings," he "assessed corresponding limitations" in Cutter's
RFC. Id.

The ALJ began his assessment of the significant medical evidence by
noting that from 2020 through 2021, Cutter's medical records show "mostly
normal findings," including that "her mental health was generally doing
better with treatment" and that she had "good control of ADHD" when she
took her medication. Id. at 20 (citing Doc. 4-8 at 34, 37, 40, 47, 53, 59). He
also observed that Wellbutrin seemed to improve her depression and that she
was "looking for work in January 2021." Id. (citing Doc. 4-8 at 34, 46, 50, 53).

The ALJ noted that in 2021 and 2022, Cutter reported generally worse
mental health than the previous years and began to focus treatment on PTSD
and anxiety rather than depression and ADHD. Id. Still, the ALJ found that
there were "no significant, objective abnormalities" during this period. Id.
She was prescribed sertraline in March 2022 but never took it, though she
did attend therapy remotely, which "she found helpful." Id. (citing Doc. 4-8 at
74, 77). The ALJ observed that "claimant's unwillingness to try the

medication prescribed by her doctor is generally inconsistent with the

extreme severity of symptoms that she alleged." Id. He added that:

> [N]umerous mental status examinations [conducted through this
> period] showed unremarkable findings, except for a sad, anxious,
> and ruminative mood, with unremarkable behavior, speech,
> language, thought process, associations, thought content,
> perceptions, sensorium, memory, attention, abstract reasoning,
> fund of knowledge, intelligence, insight, and judgment.

Id. He also noted that Cutter's GAD-7 and PHQ-9 questionnaires indicated

"moderately severe symptoms of anxiety and depression." Id.

The ALJ acknowledged that Cutter began behavioral health treatment

with a new provider, Community Partners, later in August 2022 due to

"'debilitating anxiety' with agoraphobia and panic." Id. However, the ALJ still

found that her mental status examinations showed "unremarkable objective

findings." Id. In September 2022, the ALJ noted that Cutter again "reported

severe anxiety and agoraphobia" but found that an objective examination

"showed unremarkable findings, including euthymic mood, stable affect, and

normal speech, thought process, thought content, perception, cognition, and

intelligence." Id. (citing Doc. 4-10 at 116-17; 121-22).

After considering the relevant evidence, the ALJ concluded that

Cutter's "symptoms were being managed well with routine medications

without significant side effects" for most of the covered period. Id. at 21.

While he acknowledged Cutter's own reports of worsening symptoms from

anxiety and agoraphobia from 2021 through the date last insured, he concluded that "objective medical findings indicated minimal mental limitations." Id. In light of this conclusion, the ALJ "limited her to simple work with the mental restrictions detailed above in the RFC" but noted that "objective medical findings are inconsistent with any greater limitations." Id.

The ALJ did consider Cutter's "one-time neuropsychological evaluation" in May 2023 with Catherine Leveroni, PhD, "which showed two areas of cognitive weakness with mild difficulty in inhibitory cognitive control and significant difficulty in strategic learning and memory, in the context of anxiety and distress." Id. (citing Doc. 4-9 at 45). He said that he considered these findings in limiting Cutter to a reduced range of simple work. Id. Still, because the evaluation occurred "several months after the date last insured," and because it was inconsistent with objective mental status examinations of Cutter through the date last insured, he did not give the neuropsychological evaluation significant weight. Id.

The ALJ also considered the findings of state-agency psychological consultants that there was "insufficient evidence to evaluate the claim prior to the date last insured," explaining that nonetheless as an ALJ, he was able to determine Cutter's mental residual capacity "based on the totality of

evidence" when viewed "in the light most favorable to the claimant." Id.

(citing 20 C.F.R. § 404.1546).

Finally, the ALJ stated that he fully considered the MRFCAs but did

not find them persuasive. Id. He concluded that Debatis's conclusions in the

August 2023 MRFCA that Cutter "has marked and extreme mental

limitations, . . . would be off task at least 20 percent of the time, and . . .

would be absent 10 days per month" were unpersuasive. Id. (citing Doc. 4-11

at 126-31). He likewise said that the November 2023 MRFCA, which was

largely duplicative of the August 2023 MRFCA but also "cosigned by Mark

Berman, M.D.," was unpersuasive. Id. (citing Doc. 4-12 at 41-44). The ALJ

said both opinions were poorly supported and inconsistent with other

unspecified medical evidence. Id.

At step four, the ALJ found that Cutter was "unable to perform any

past relevant work. Id. at 23. He based this conclusion on Atkinson's

responses to questions about a hypothetical individual with Cutter's RFC. Id.

At step five, the ALJ found that there were jobs that "existed in significant

numbers in the national economy that the claimant could have performed"

through the date last insured. Id. at 24. He based this finding upon

Atkinson's testimony that Cutter would have been able to perform several

representative occupations including:

(1) Merchandise Marker (D.O.T. 209.587-034), which is light, unskilled work at SVP-2, and of which there are approximately 160,000 jobs in the national economy;

(2) Assembler Small Parts (D.O.T. 739.687-030), which is light, unskilled work at SVP-2, and of which there are approximately 22,000 jobs in the national economy; and

(3) Routing Clerk (D.O.T. 222.587-038), which is light, unskilled work at SVP-2, and of which there are approximately 22,000 jobs in the national economy.

Id. Based on the foregoing, the ALJ concluded that, "through the date last insured," Cutter "was capable of making a successful adjustment to other work that existed in significant numbers in the national economy." Id. Based on this conclusion, the ALJ decided that "a finding of 'not disabled' is therefore appropriate" in Cutter's case. Id.

## II. <u>STANDARD OF REVIEW</u>

I am authorized to review the pleadings submitted by the parties and the administrative record and enter a judgment affirming, modifying, or reversing the "final decision" of the Commissioner. 42 U.S.C. § 405(g). That review is limited, however, "to determining whether the [Commissioner] used the proper legal standards and found facts [based] upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000). I defer to the Commissioner's findings of fact so long as those findings are supported by substantial evidence. Id. Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could

accept it as adequate to support his conclusion." Irlanda Ortiz v. Sec'y of Health & Hum. Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (quoting Rodriguez v. Sec'y of Health & Hum. Servs., 647 F.2d 218, 222 (1st Cir. 1981)).

If the Commissioner's findings are supported by substantial evidence, they are conclusive, even where the record "arguably could support a different conclusion." Id. at 770. But his findings are not conclusive "when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam). "Issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Commissioner, and the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [him], not for the doctors or for the courts." Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018) (citation modified) (quoting Rodriguez, 647 F.2d at 222).

### III. <u>ANALYSIS</u>

Cutter argues that the ALJ's RFC determination is fatally flawed because it fails to account for the medical opinions of Debatis and Berman in the August 2023 and November 2023 MRFCAs that Cutter's anxiety,

depression, and agoraphobia would cause her to miss at least ten days per month of work.

When considering medical opinions, an ALJ need not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a). Rather, to determine the persuasiveness of a medical opinion, an ALJ considers five factors: supportability, consistency with other medical sources, relationship with the claimant, specialization, and "[o]ther factors." Id. § 404.1520c(c). The most important among these factors are supportability and consistency. And the ALJ is only required to articulate how he considered these two factors in his decision. Id. § 404.1520c(b)(2).

As a preliminary matter, I note that Debatis and Berman are both medical sources whose relevant medical opinions[14]—here, the MRFCAs— must be addressed by an ALJ when formulating a claimant's RFC. Id. § 404.1502. Berman is considered an "acceptable medical source," while Debatis is a "medical source." Id. Further, the fact that Berman signed the

---

[14]    A "medical opinion" is any statement from a medical source "about what you can still do despite your impairment[s] and whether you have one or more impairment-related limitations or restrictions" for a series for abilities, including the "ability to perform mental demands of work activities." Id. at § 404.1513(a)(2).

26

November 2023 MRFCA requires the ALJ to treat it as his medical opinion

because, as this court has previously recognized, "[w]here a treating

acceptable medical source co-signs a non-acceptable medical source's opinion,

the resulting opinion constitutes that of both sources." Nichols v. US Soc. Sec.

Admin., 2018 WL 1307645 at 10 n.9 (D.N.H. 2018), citing King v. Colvin, 128

F. Supp. 3d 421, 436 n.14 (D. Mass. 2015).[15] See also Hargett v. Comm'r of

Soc. Sec., 964 F. 3d 546, 553 (6th Cir. 2020) ("a doctor's cosignature indicates

at a minimum that the doctor agrees with the other source's opinion.").

Although the ALJ attempted to analyze both medical opinions for

supportability and consistency as the regulations require, his decision to

discount the opinions is not supported by substantial evidence. Viewing the

ALJ's decision generously, he concludes that Debatis's opinions are not

supportable because Debatis "did not begin treating the claimant until

August 2022, yet she concluded that the claimant was functioning at this

level since 2020." Doc. 4-2 at 22. He discounts Berman's opinions because he

claimed that they were at odds with Berman's own June 2020 determination

---

[15]    Nichols and King were decided under previous regulations, but their logic still applies here. In fact, King is factually analogous to the present case: there, the court found that the signature of the claimant's treating psychiatrist—a medical doctor—on a social worker's "Mental Impairment Questionnaire" made that evidence the opinion of both sources. King, 128 F. Supp. 3d at 436.

that Cutter could return to work. Id. The ALJ added that their

determinations in the MRFCAs concerning the severity of Cutter's mental

impairments were inconsistent with objective medical evidence showing that

Cutter had "good control" of her symptoms in 2020 and 2021 and

"unremarkable findings" from mental status examinations from 2021 through

the date last insured. Id. at 22-23. I explain why these determinations do not

withstand scrutiny in the discussion that follows.

1.    Supportability

The ALJ's decision to discount Debatis's opinions because she did not

begin to treat Cutter until the end of her insured period fails to account for

the fact that Berman, Cutter's primary care provider and treating physician

during Cutter's entire insured period, endorsed Debatis's opinions when he

signed the November 2023 MRFCA. Id. at 22. As noted, "[w]here a treating

acceptable medical source co-signs a non-acceptable treating medical source's

opinion, the resulting opinion constitutes that of both sources." King, 128

F. Supp. 3d at 436 n.14. Berman served as Cutter's primary care physician

during the covered period, and his "cosignature indicates at a minimum that

the [he] agrees with" Debatis's assessment of Cutter from 2020 through 2023

as documented in the November 2023 MRFCA. Hargett v. Comm'r of Soc.

Sec., 964 F. 3d at 553. Therefore, the ALJ cannot discount Debatis's opinion

simply because she did not begin to treat Cutter until her insured period was about to end.

Moreover, the sustained relationship Berman maintained with Cutter during the covered period and beyond weighs in favor of finding both MRFCAs persuasive. As outlined in 20 C.F.R. § 404.1520c(c)(3), when a medical source's "relationship with [a] claimant" is long-term and defined by frequent examinations, as was the case in the relationship between Berman and Cutter, that source's opinions are thought to be more persuasive than a those generated during a short-term relationship. Due to Berman's sustained relationship with Cutter, his signature of the November MRFCA shows that he has affirmed Debatis's assessment of Cutter from 2020 through 2023. The ALJ failed to acknowledge that Berman, by signing the MRFCA, himself agreed that Cutter's agoraphobia had persisted since 2020 and would prevent her from attending work at least twenty times a month. Thus, he was wrong to view the MRFCA opinions as poorly supported simply because Debatis did not begin treating Cutter until late 2022.

The ALJ also faulted Debatis and Berman for providing "minimal objective support" for their conclusions regarding Cutter's mental state, yet the ALJ failed to discuss either Debatis or Berman's "supporting explanations" for their opinions. Doc. 4-11; 4-12. Under the regulations, "[t]he

more relevant objective medical evidence and <u>supporting evidence</u> presented by a medical source to support his or her medical opinion(s) . . . the more persuasive the medical opinion(s) . . . will be." 20 C.F.R. § 404.1520c(c)(1) (emphasis added). The ALJ is correct that Berman and Debatis do not offer objective medical evidence in support of their opinions.[16] However, they do provide "supporting explanations" for their opinions in the form of "other medical evidence." <u>Id.</u> § 404.1513(a)(3). Namely, the administrative record contains dozens of examination notes Berman and Debatis prepared while treating Cutter that form the basis for their opinions. Doc. 4-8; 4-11; 4-12.

While evidence after the covered period can only be used to the extent that it helps prove disability during the covered period, several of Berman and Debatis's treatment notes can be used to show Cutter's agoraphobia, depression, and anxiety during the covered period. <u>See</u> Gage v. O'Malley, 748 F. Supp. 3d, 48, 56 n. 7 (D.N.H. 2024). Although Berman did not specifically diagnose Cutter with agoraphobia during the covered period, he repeatedly diagnosed her with depression and anxiety during this period, urged counseling, and prescribed two different medications to manage her

---

[16]    "Objective medical evidence is medical signs, laboratory findings, or both." 20 C.F.R. § 404.1502(f).

symptoms;[17] he also conducted his appointments with Cutter over the phone, which is suggestive of her fear of leaving the home. Doc. 4-8 at 28, 40, 53, 58, 70. Debatis did specifically document Cutter's severe agoraphobia and anxiety during the covered period. Doc. 4-11 at 140-41. Moreover, Debatis's notes after the covered period can be used to show Cutter's agoraphobia during the covered period, as her impairments persisted from 2020 onward. In her therapy notes from October 2022 through December 2024, Debatis repeatedly recorded Cutter's difficulty leaving the house, the level of preparation Cutter required before going out in public, and her symptoms of anxiety and depression. Doc. 4-11; 4-12.

Finally, it is difficult to imagine what kind of objective medical evidence the ALJ expected to find in the record that would affirm Cutter's agoraphobia diagnosis. As another circuit has persuasively argued, "mental health impairments are not 'readily amenable' to substantiation by objective

---

[17]    Although the ALJ does not specifically cite Cutter's unwillingness to take sertraline as a reason why he finds the MRFCAs unpersuasive, he does generally note that her "unwillingness to try the medication prescribed by her doctor is generally inconsistent with the extreme severity of symptoms that she alleged." Doc. 4-2. While unwillingness to try medication may be used to undercut the alleged severity of a claimant's symptoms, see SSR 16-3P at 9, guidance also recognizes that "an individual may not agree to take prescription medications because the side effects are less tolerable than the symptoms." Id. at 10. Here, Cutter noted that she did not take sertraline due to fear of adverse side effects. Doc. 4-10 at 121.

testing because 'unlike a broken arm, a mind cannot be x-rayed.'" George K. v. Kijakazi, 2022 WL 3134428 at *4 (D.Md. 2022) (citing Poulin v. Bowen, 817 F.2d 865, 873 (D.C. Cir. 1987)). Thus, the lack of objective medical evidence of Cutter's agoraphobia does not undermine the MRFCAs' supportability. Although the ALJ is correct that neither Berman nor Debatis's treatment notes provide objective medical evidence in support of the Debatis-Berman opinions, that fact is not dispositive, and he still erred by failing to acknowledge the other medical evidence they provided in support of their opinions.

    2.   Consistency

Likewise, the ALJ erred by concluding that the MRFCA opinions were inconsistent with other medical evidence in the record. He deployed flawed reasoning, misstated medical evidence, and ignored consistent evidence in making this assessment. In his decision, the ALJ makes much of the fact that Berman said "Cutter could return to work with masking in June 2020" and suggests that Berman's recommendation that Cutter return to work directly conflicts with his later opinion in the November 2023 MRFCA that Cutter would need to miss work at over twenty times a month because of her agoraphobia. Doc. 4-2 at 22. However, the ALJ's discussion of Berman's 2020 recommendation omits critical context. When Berman said Cutter "may

return to work" but needed to wear a mask and avoid enclosed spaces with other, unmasked people, he was making those recommendations in relation to Cutter's asthma diagnosis, not her agoraphobia. Doc. 4-8 at 34. Berman was the one who initially recommended Cutter stop working in March 2020 due to her asthma during the ongoing COVID-19 pandemic. Id. at 28. Thus, when he authorized her to return to work in June 2020, he was only saying that her asthma was sufficiently managed to allow her to do so. He was not making a finding regarding her agoraphobia or mental capacity to regularly attend work outside the home.

The ALJ also said that the Debatis and Berman's opinions concerning the severity of Cutter's mental impairments were inconsistent with objective examinations of Cutter through her date last insured. Doc. 4-2 at 22. He specifically noted that while Cutter "reported subjective worsening" of her mental symptoms from late 2021 through 2023, "objective examinations through the date last insured w[]ere inconsistent with her extreme allegations" and "numerous mental status examinations showed unremarkable findings." Id. In coming to this conclusion, the ALJ placed significant weight on routine "mental status exam[s]" conducted by Quint, Merrill, and Roper during their telephone appointments with Cutter; these examinations yielded unremarkable results but did note Cutter was

"anxious," "sad," and "ruminative." Id. These mental status examinations only assessed metrics like "speech," "mood," "neurovegetative symptoms," "thought content," "perceptions," and "intelligence;" they notably failed to assess the severity of Cutter's anxiety or agoraphobia. Doc. 4-11 at 32. Thus, they do not necessarily undermine Cutter's statements about the worsening of her agoraphobia symptoms between 2021 and 2023. In fact, Quint, Merrill, and Roper documented Cutter's symptoms of anxiety and agoraphobia on the very same days the mental status examinations they conducted yielded "unremarkable" results. Finally, all of these mental status examinations were conducted over the phone. Given the fact that Cutter's mental health impairment was her agoraphobia, it is not surprising that she would have a normal mental status exam when speaking from her home.

The ALJ's conclusion that the MRFCAs are inconsistent with other medical evidence also ignores other important evidence. Under current regulations, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." 20 C.F.R. § 404.1520c(c)(2). Here, the ALJ failed to address significant evidence consistent with the MRFCAs. First, the ALJ failed to address Cutter's GAD-7 score of 18 in both January and June 2022, which showed that her symptoms

34

of anxiety were "severe." Doc. 4-9 at 5; Doc. 4-8 at 107. In fact, the ALJ

misstated the findings from Cutter's GAD-7 assessment in his decision,

noting that they indicated "moderately severe," rather than severe, symptoms

of anxiety. Doc. 4-2 at 20. Nor did he address Quint's 2021 and 2022 findings

that Cutter would not leave her house and resorted to ordering items online.

Doc. 4-8 at 88-122. Moreover, he failed to discuss Merrill's August 2022

opinion which described Cutter's severe anxiety, near inability to leave her

house, and historical diagnoses of both major depression and panic disorder

with agoraphobia. Doc. 4-11 at 131. Finally, he did not account for Roper's

September 2022 opinion showing that Cutter "cannot leave [her] house."

Doc. 4-10 at 121. All of these opinions—each coming from separate medical

sources during the covered period—are consistent with Debatis and Berman's

MRFCA opinions. Because the ALJ failed to consider this consistent

evidence, his finding that Berman and Debatis's opinions are inconsistent is

not supported by substantial evidence.

I thus conclude that the ALJ failed to properly consider the MRFCAs

when assessing Cutter's RFC. The ALJ's reasons for giving Debatis and

Berman's opinions no weight—that they were poorly supported and

inconsistent—were not supported by substantial evidence. Moreover, the ALJ

did not identify any countervailing evidence to undermine their conclusion

that Cutter suffers from agoraphobia and would have to miss at least ten days of work on account of this mental impairment. The ALJ's erroneous treatment of their opinions invalidates his assessment of Cutter's RFC and requires remand.

## IV.  CONCLUSION

The Commissioner's motion to affirm (Doc. 7) is denied and Cutter's motion to reverse or remand (Doc. 5) is granted. Pursuant to sentence four of 42 U.S.C. § 405(g), I remand the case to the Social Security Administration for further proceedings consistent with this decision.

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

December 9, 2025

cc:    Counsel of Record

36